# United States District Court
## EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

One Gateway Computer Tower GT5694, a Panasonic HDC HS9 video camera with internal hard drive memory, and Iphone located at N96 W14250 County Line Road, Germantown, Washington County, State and Eastern District of Wisconsin, 53022, a single family ranch with an attached two car garage, green colored siding, white trim, gray shingles, and tan colored brick facade.

CASE NUMBER: 13-836 M (NJ)

## APPLICATION & AFFIDAVIT FOR SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

One Gateway Computer Tower GT5694, a Panasonic HDC HS9 video camera with internal hard drive memory, and Iphone, located at N96 W14250 County Line Road, Germantown, Washington County, State and Eastern District of Wisconsin, 53022, a single family ranch with an attached two car garage, green colored siding, white trim, gray shingles, and tan colored brick facade.

located in the Eastern District of Wisconsin there is now concealed: **certain property, namely those items listed in Attachment B.**

The basis for the search warrant under Fed. R. Crim. P. 41(c) is which is:
        √ evidence of a crime;
        √ contraband, fruits of a crime, or other items illegally possessed;
        √ property designed for use, intended for use, or used in committing a crime;
        ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of: Title 18 U.S.C. Sections 842(a)(1) and 842(j).

The application is based on these facts:
        √ Continued on the attached sheet.
        ❑ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Signature of Affiant,

__Special Agent John Adamson__
Printed Name and Title

Sworn to before me, and subscribed in my presence.

__May 1, 2013 4:50 a.m./p.m.__
Date and time issued

__Milwaukee, Wisconsin__
City and State

The Honorable Nancy Joseph
__United States Magistrate Judge__
Name & Title of Judicial Officer

Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, John Adamson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as N96W14250 County Line Road, Germantown, Washington County, State and Eastern District of Wisconsin (53022), hereinafter "PREMISES,"; one black 1997 Toyota Camry LE VIN #4T1BG22K3VU011987 bearing Wisconsin plates "RB12B4"; one Gateway computer tower GT5694; and one Panasonic HDC HS9 video camera with internal hard drive memory.   The items are further described in Attachment A.

2.     I am employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since May of 1999.  In the course of my work, I investigate violations of federal firearm and explosives laws and related violations.

3.     Title 18 United States Code (USC) section 842(a)(1) prohibits any person to engage in the business of importing, manufacturing, or dealing in explosive materials without a license; and Title 18 USC section 842(j) prohibits any person to store any explosive material in a manner not in conformity with regulations promulgated.

4.     "Explosive materials" means explosives, blasting agents and detonators.  See, Title 18 U.S.C. §841.  Explosives include any chemical compound, mixture or device, the

primary or common purpose of which is to function by explosion. The term explosives includes but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squids, detonating cord, igniter cord and igniters.

## **PROBABLE CAUSE**

5.     The facts contained in this affidavit are known to me through my personal knowledge, training and experience, through information provided to me by others, and through information provided to me by other law enforcement officers and my review of official law enforcement records and reports which I consider to be truthful and reliable.

6.     Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrant.

7.     This affidavit is made in support of an application for a search warrant for the premises located at N96W14250 County Line Road, Germantown, Washington County, State and Eastern District of Wisconsin (53022); one black 1997 Toyota Camry LE VIN #4T1BG22K3VU011987 bearing Wisconsin plates "RB12B4"; one Gateway computer tower GT5694; an IPhone; and one Panasonic HDC HS9 video camera with internal hard disk memory. All of the aforementioned items are located at the PREMISES. Law enforcement is seeking to locate and seize the items identified in Attachment B.

8.     On Tuesday April 30, 2013, Mary E. WITZLIB ( hereinafter "Mary") went to the
Germantown Police Department wherein she reported concerns she has over her nephew,
BODIE B. WITZLIB (DOB XX/XX/1979),(hereinafter "BODIE") being in possession of alleged
explosive devices. BODIE lives at N96W14250 County Line Road, Germantown, Wisconsin
with Mary's mother-in-law, BODIE's grandmother Ruth Witzlib.  Mary claims BODIE has
mental health issues; claims he is not taking his medication; she believes he is anti-government;
claims to be afraid of BODIE and believes BODIE is unpredictable.  Mary related on Saturday
April 27, 2013, her husband Dennis Witzlib, Ruth's son, told her that he went into the basement
of said premises on April 27, 2013 and saw boxes of what he believed to be M80 explosive
devices, based on what BODIE told Dennis in the past.  Dennis said BODIE told him he was
starting a business and was going to sell them.

9.     On Tuesday April 30, 2013, officers from the Germantown Police Department
spoke with Dennis Witzlib (hereinafter "Dennis").  In summary, Dennis reported on Saturday
April 27, 2013, he went to his mother's residence (BODIE's grandmother) at N96W14250
County Line Road, Germantown to check on the house.  As Dennis went into the basement of
the residence, he observed what he believed to be materials and finished product of M80
explosive devices.  Dennis said he was aware that BODIE was making M80's in the residence, as
he observed him doing so approximately a month earlier in the family room of the residence.
Dennis told BODIE that he needed to get all that stuff out of the house, as it was illegal.  Dennis
did not know that BODIE had moved the materials into the basement.  Dennis said BODIE made
brochures to sell the M80's he was making.

3

10.     Dennis said on April 29, 2013, he confronted BODIE about the M80 explosive devices in the basement and told BODIE that BODIE needed to get rid of the explosives or the police would be called.  BODIE began bringing up boxes of the M80's he had made to the garage area.  Dennis also stated that he observed BODIE's car backed up to the garage area on two occasions since speaking to him about getting rid of the items.  Dennis thinks BODIE may have M80 explosive devices in the trunk of his vehicle, later identified as one 1997 black Toyota Camry VIN #4T1BG22K3VU011987 bearing Wisconsin license plates "RB12B4", or took them over to his other grandmother's residence, Ms. Hilda Olson, who lives in the Colgate area. Olson was later interviewed and informed law enforcement that BODIE came to her home on April 30, 2013 for a few minutes.  Ms. Olson granted consent to search and law enforcement officers found military grade aluminum powder and approximately fifteen pounds of Percholate which is used in the construction of explosives in the shed.

11.     Dennis believes BODIE looked up how to make the M80 explosive devices on the internet, as well as created and printed the brochures from his computer, which is located in the family room.  Dennis indicated BODIE spends a significant amount of time on the computer. Based on my training and experience information can be found on the internet about constructing explosive devices.

12.     On Tuesday April 30, 2013, officers went to said PREMISES.  There, officers made contact with BODIE and Ruth Witzlib.  BODIE said he would like to assert his Fourth Amendment rights.  Ruth told officers she knew why officers were there, that BODIE was making fireworks in the basement, however, she thought BODIE had gotten rid of most of the

4

stuff and planned to get rid of the rest of the stuff the following day. Ruth gave officers consent to search her residence. Ruth said BODIE has a bedroom in her residence and that the entire residence is accessible to her. Ruth said she goes into the basement to do laundry and goes into all of the rooms in the house, to include BODIE's bedroom. Ruth said BODIE does not pay her rent for living at her residence.

13.     ATF Special Agent Jody Keeku and members of the Milwaukee County Bomb Unit proceeded to search said residence. Upon returning from the basement of the residence, Special Agent Keeku confirmed that there were explosive devices consistent to M80's in the basement. For safety concerns, the residence and nearby residences were evacuated.

14.     Special Agent Keeku, who is trained as a certified explosive specialist informed me when you mix several powders (potassium Perchorate, black powder and aluminum powder) you get a flash powder that is very sensitive to heat, static and friction. Even just a spark of static can ignite or detonate the powder. If one device ignites or detonates it can set off all of the other devices in the immediate vicinity. Due to the volatile nature of the explosive materials, and that it was impractical and unsafe to move the explosives, the items were destroyed. See, 18 U.S.C. 844(c)(2).

15.     Special Agent Keeku advised there were approximately 600 devices the size of M80's and four larger devices, approximately three times the size of the M80's located in the basement. There was one package of unknown raw material in the basement. Special Agent Keeku believes this material to be Perchlorate, which is oftentimes mixed with black powder to create such devices.

5

16.     BODIE was taken into state custody for possessing explosives.  At the Germantown Police Department, BODIE was advised of his Miranda rights.  BODIE waived and indicated he would talk with officers so long as he did not incriminate himself.  Throughout the custodial interview of BODIE, BODIE was very evasive with his answers, oftentimes indicating that he did not want to incriminate himself.  In summary, BODIE indicated he had created a company called "G.I Fireworks",that the "G" stood for Ground and the "I" stood for Infantry. BODIE said he was making fireworks and that he was in the process of getting a license to do so, however he did not have enough money to make his business a legitimate business.  BODIE indicated he sold some of his product to friends and had given some away to friends.  BODIE said he produced a product safety sheet on how to use his products and not get hurt; and said there was a copy of this safety sheet on his desk next to his backpack.  BODIE indicated he looked on YouTube on how to make the items.  BODIE said one could Google how to make an M80, however made a point of saying that he was not saying he Googled how to make an M80. BODIE spoke about ordering material online and when asked if he made any purchases in local stores, he said he did not.  BODIE indicated that it was his hope to expand his business online and with firework stores.  BODIE would not respond with what materials he made the M80 devices or how much of the material he used in each device.  BODIE said he did not weigh the items when filling them.  BODIE made specific reference to German aluminum powder.  BODIE would not say if the white powder observed was Perchlorate.  BODIE would not say he used or mixed Perchlorate, black powder and aluminum powder together and did not object that these items were purportedly mixed.

6

17.     In addition to the computer, BODIE possesses a cell phone which was observed near the computer.  Based on experience I am aware that many cell phones have internet access and extensive media storage capabilities, including maintaining logs, contact list, images and email accounts.  BODIE's phone is an IPhone so it has all of the aforementioned capabilities. Considering that BODIE acknowledges selling and giving away his explosive devices the IPhone, computer and any other media storage devices could contain evidence that will enable law enforcement to locate the other devices and contain evidence of the crime.

18.     On April 30, 2013, for safety reasons officers secured the premises. On May 1, 2013, bomb squad officers removed all of the devices from the premises.  Law enforcement is now seeking to obtain a search warrant for said residence, computer, video camera, other media devices, and BODIE's vehicle, one 1997 Black Toyota Camry with VIN #4T1BG22K3VU011987 bearing Wisconsin plates "RB12B4".

19.     That also based on my training and experience, it is within the knowledge of the Affiant that it is usual and customary practice for individuals who manufacture, store and sell illegal explosive materials often do so at their residences.  Further, due to the volatile nature of the explosive materials, their improper manufacture and storage in a residence usually poses extreme danger to the resident/possessor, as well as nearby residents and their property.  Finally, there have been numerous documented instances of similar clandestine unlawful explosive operations in residential buildings wherein there have been fatalities and substantial property damage.

20.     On May 1, 2013, I have observed the property and the property may be described as a single family ranch with an attached two car garage, green colored siding, white trim, gray shingles, tan colored brick façade on the front of the house below the windows, address N96 W14250 affixed to the front of the residence to the left of the garage door.

21.     On May 1, 2013, I consulted with ATF Industry Operations Investigator Lee Taylor, who advised no explosive license was issued to either BODIE WITZLIB and/or to GI Fireworks.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

22.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, recording devices, cell phones or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

23.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

8

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  Based on information provided to me by other law enforcement officer, I know that when an individual uses a computer to, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of

10

the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

24.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic

11

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

26.     Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## FORFEITURE

27.     ATF is seeking to seize and forfeit the explosive materials pursuant to 18 USC 844 (c)(1).  Any explosive materials involved or used or intended to be used in any violation of the provisions of this chapter or any other rule or regulation promulgated thereunder or any violation of any criminal law of the United States shall be subject to seizure and forfeiture.

28.     In accordance with 18 U.S.C. §844(c)(2), in the case of the seizure of any explosive materials for any offense for which the materials would be subject to forfeiture in which it would be impracticable or unsafe to remove the materials to a place of storage or would be unsafe to store them, the seizing officer may destroy the explosive materials forthwith.  As noted in paragraph 14, the explosive materials were destroyed, and a representative sampling was retained.

13

## <u>CONCLUSION</u>

29.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES, vehicle and computer described in Attachment A and seize the items described in

Attachment B.

## ATTACHMENT A

-The premises to be searched is located at N96W14250 County Line Road, Germantown, Washington County, in the State and Eastern District of Wisconsin, to include all storage areas accessible to N96W14250 County Line Road. This location is more fully described as a single family ranch with an attached two car garage, green colored siding, white trim, gray shingles, tan colored brick façade on the front of the house below the windows, address N96 W14250 affixed to the front of the residence to the left of the garage door.

-The computer is described as Gateway tower GT 5694

-The vehicle is described as one 1997 black Toyota Camry with VIN #4T1BG22K3VU011987 bearing Wisconsin plates "RB12B4", four door sedan

-The video camera is described as an HDC HS9





Case 2:13-mj-00836-NJ   Filed 05/14/13   Page 17 of 23   Document 1

## ATTACHMENT B

1.      Any material which have been identified by ATF as explosives materials pursuant to 18 USC 941(d) and 27 CFR555.23 (see attachment C for complete list).

2.      Items or materials used as housing for explosives devices, including tubes, pipes, end caps, and taping material.

3.      Instrumentalities and other evidence used to construct and conceal explosive devices to wit bb's, pellets or other materials used as anti-personnel shrapnel; tools such as drills, drill bits, pliers, channel locks, etc. that may be used during the construction of said devices; switches, theremostats, glues, and other adhesives.

4.      Computers, recording devices, cell phones, photographs, diagrams, receipts, diaries, papers and other documents that constitute indicia of occupancy or evidence of the unlawful manufacturing or selling of explosives or explosives devices.

**5.**      Computers or storage media used as a means to commit the violations described above.

6.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs,

registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.  evidence of the times the COMPUTER was used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.  records of or information about Internet Protocol addresses used by the COMPUTER;

2

j.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.   contextual information necessary to understand the evidence described in this attachment.

7.   Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

3

# ATTACHMENT C



only, please so note and enclose a check in the amount of $15.00 (25 cents per page reproduction cost for the 60 page proposed Consent Decree) payable to the U.S. Treasury. If requesting by email or fax, forward a check in that amount to the Consent Decree Library at the address given above.

**Ronald G. Gluck,**
*Assistant Section Chief, Environmental Enforcement Section, Environment and Natural Resource Division.*

[FR Doc. 2012–23146 Filed 9–19–12; 8:45 am]
**BILLING CODE 4410–15–P**

---

## DEPARTMENT OF JUSTICE

### Bureau of Alcohol, Tobacco, Firearms, and Explosives

**[Docket No. ATF 47N]**

### Commerce in Explosives; List of Explosive Materials (2012R–10T)

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Department of Justice.

**ACTION:** Notice of list of explosive materials.

**SUMMARY:** Pursuant to 18 U.S.C. 841(d) and 27 CFR 555.23, the Department must publish and revise at least annually in the **Federal Register** a list of explosives determined to be within the coverage of 18 U.S.C. 841 *et seq.* The list covers not only explosives, but also blasting agents and detonators, all of which are defined as explosive materials in 18 U.S.C. 841(c). This notice publishes the 2012 List of Explosive Materials.

**DATES:** The list becomes effective September 20, 2012.

**FOR FURTHER INFORMATION CONTACT:** William J. O'Brien, Industry Liaison Analyst; Explosives Industry Programs Branch; Firearms and Explosives Industry Division; Bureau of Alcohol, Tobacco, Firearms, and Explosives; United States Department of Justice; 99 New York Avenue NE., Washington, DC 20226 (202–207–8969).

**SUPPLEMENTARY INFORMATION:** The list is intended to include any and all mixtures containing any of the materials on the list. Materials constituting blasting agents are marked by an asterisk. While the list is comprehensive, it is not all-inclusive. The fact that an explosive material is not on the list does not mean that it is not within the coverage of the law if it otherwise meets the statutory definitions in 18 U.S.C. 841. Explosive materials are listed alphabetically by their common names followed, where

applicable, by chemical names and synonyms in brackets.

The Department has not added any new terms to the list of explosive materials or removed or revised any listing since its last publication.

This list supersedes the List of Explosive Materials dated October 19, 2011 (Docket No. ATF 47N, 76 FR 64974).

### Notice of List of Explosive Materials

Pursuant to 18 U.S.C. 841(d) and 27 CFR 555.23, I hereby designate the following as explosive materials covered under 18 U.S.C. 841(c):

*A*

Acetylides of heavy metals.
Aluminum containing polymeric propellant.
Aluminum ophorite explosive.
Amatex.
Amatol.
Ammonal.
Ammonium nitrate explosive mixtures (cap sensitive).
* Ammonium nitrate explosive mixtures (non-cap sensitive).
Ammonium perchlorate having particle size less than 15 microns.
Ammonium perchlorate explosive mixtures (excluding ammonium perchlorate composite propellant (APCP)).
Ammonium picrate [picrate of ammonia, Explosive D].
Ammonium salt lattice with isomorphously substituted inorganic salts.
* ANFO [ammonium nitrate-fuel oil].
Aromatic nitro-compound explosive mixtures.
Azide explosives.

*B*

Baranol.
Baratol.
BEAF [1, 2-bis (2, 2-difluoro-2-nitroacetoxyethane)].
Black powder.
Black powder based explosive mixtures.
* Blasting agents, nitro-carbo-nitrates, including non-cap sensitive slurry and water gel explosives.
Blasting caps.
Blasting gelatin.
Blasting powder.
BTNEC [bis (trinitroethyl) carbonate].
BTNEN [bis (trinitroethyl) nitramine].
BTTN [1,2,4 butanetriol trinitrate].
Bulk salutes.
Butyl tetryl.

*C*

Calcium nitrate explosive mixture.
Cellulose hexanitrate explosive mixture.
Chlorate explosive mixtures.
Composition A and variations.

Composition B and variations.
Composition C and variations.
Copper acetylide.
Cyanuric triazide.
Cyclonite [RDX].
Cyclotetramethylenetetranitramine [HMX].
Cyclotol.
Cyclotrimethylenetrinitramine [RDX].

*D*

DATB [diaminotrinitrobenzene].
DDNP [diazodinitrophenol].
DEGDN [diethyleneglycol dinitrate].
Detonating cord.
Detonators.
Dimethylol dimethyl methane dinitrate composition.
Dinitroethyleneurea.
Dinitroglycerine (glycerol dinitrate).
Dinitrophenol.
Dinitrophenolates.
Dinitrophenyl hydrazine.
Dinitroresorcinol.
Dinitrotoluene-sodium nitrate explosive mixtures.
DIPAM [dipicramide; diaminohexanitrobiphenyl].
Dipicryl sulfone.
Dipicrylamine.
Display fireworks.
DNPA [2,2-dinitropropyl acrylate].
DNPD [dinitropentano nitrile].
Dynamite.

*E*

EDDN [ethylene diamine dinitrate].
EDNA [ethylenedinitramine].
Ednatol.
EDNP [ethyl 4,4-dinitropentanoate].
EGDN [ethylene glycol dinitrate].
Erythritol tetranitrate explosives.
Esters of nitro-substituted alcohols.
Ethyl-tetryl.
Explosive conitrates.
Explosive gelatins.
Explosive liquids.
Explosive mixtures containing oxygen-releasing inorganic salts and hydrocarbons.
Explosive mixtures containing oxygen-releasing inorganic salts and nitro bodies.
Explosive mixtures containing oxygen-releasing inorganic salts and water insoluble fuels.
Explosive mixtures containing oxygen-releasing inorganic salts and water soluble fuels.
Explosive mixtures containing sensitized nitromethane.
Explosive mixtures containing tetranitromethane (nitroform).
Explosive nitro compounds of aromatic hydrocarbons.
Explosive organic nitrate mixtures.
Explosive powders.

*F*

Flash powder.

Fulminate of mercury.
Fulminate of silver.
Fulminating gold.
Fulminating mercury.
Fulminating platinum.
Fulminating silver.

*G*

Gelatinized nitrocellulose.
Gem-dinitro aliphatic explosive mixtures.
Guanyl nitrosamino guanyl tetrazene.
Guanyl nitrosamino guanylidene hydrazine.
Guncotton.

*H*

Heavy metal azides.
Hexanite.
Hexanitrodiphenylamine.
Hexanitrostilbene.
Hexogen [RDX].
Hexogene or octogene and a nitrated N-methylaniline.
Hexolites.
HMTD [hexamethylenetriperoxidediamine].
HMX [cyclo-1,3,5,7-tetramethylene 2,4,6,8-tetranitramine; Octogen].
Hydrazinium nitrate/hydrazine/ aluminum explosive system.
Hydrazoic acid.

*I*

Igniter cord.
Igniters.
Initiating tube systems.

*K*

KDNBF [potassium dinitrobenzo-furoxane].

*L*

Lead azide.
Lead mannite.
Lead mononitroresorcinate.
Lead picrate.
Lead salts, explosive.
Lead styphnate [styphnate of lead, lead trinitroresorcinate].
Liquid nitrated polyol and trimethylolethane.
Liquid oxygen explosives.

*M*

Magnesium ophorite explosives.
Mannitol hexanitrate.
MDNP [methyl 4,4-dinitropentanoate].
MEAN [monoethanolamine nitrate].
Mercuric fulminate.
Mercury oxalate.
Mercury tartrate.
Metriol trinitrate.
Minol-2 [40% TNT, 40% ammonium nitrate, 20% aluminum].
MMAN [monomethylamine nitrate]; methylamine nitrate.
Mononitrotoluene-nitroglycerin mixture.

Monopropellants.

*N*

NIBTN [nitroisobutametriol trinitrate].
Nitrate explosive mixtures.
Nitrate sensitized with gelled nitroparaffin.
Nitrated carbohydrate explosive.
Nitrated glucoside explosive.
Nitrated polyhydric alcohol explosives.
Nitric acid and a nitro aromatic compound explosive.
Nitric acid and carboxylic fuel explosive.
Nitric acid explosive mixtures.
Nitro aromatic explosive mixtures.
Nitro compounds of furane explosive mixtures.
Nitrocellulose explosive.
Nitroderivative of urea explosive mixture.
Nitrogelatin explosive.
Nitrogen trichloride.
Nitrogen tri-iodide.
Nitroglycerine [NG, RNG, nitro, glyceryl trinitrate, trinitroglycerine].
Nitroglycide.
Nitroglycol [ethylene glycol dinitrate, EGDN].
Nitroguanidine explosives.
Nitronium perchlorate propellant mixtures.
Nitroparaffins Explosive Grade and ammonium nitrate mixtures.
Nitrostarch.
Nitro-substituted carboxylic acids.
Nitrourea.

*O*

Octogen [HMX].
Octol [75 percent HMX, 25 percent TNT].
Organic amine nitrates.
Organic nitramines.

*P*

PBX [plastic bonded explosives].
Pellet powder.
Penthrinite composition.
Pentolite.
Perchlorate explosive mixtures.
Peroxide based explosive mixtures.
PETN [nitropentaerythrite, pentaerythrite tetranitrate, pentaerythritol tetranitrate].
Picramic acid and its salts.
Picramide.
Picrate explosives.
Picrate of potassium explosive mixtures.
Picratol.
Picric acid (manufactured as an explosive).
Picryl chloride.
Picryl fluoride.
PLX [95% nitromethane, 5% ethylenediamine].
Polynitro aliphatic compounds.
Polyolpolynitrate-nitrocellulose explosive gels.

Potassium chlorate and lead sulfocyanate explosive.
Potassium nitrate explosive mixtures.
Potassium nitroaminotetrazole.
Pyrotechnic compositions.
PYX [2,6-bis(picrylamino)] 3,5-dinitropyridine.

*R*

RDX [cyclonite, hexogen, T4, cyclo-1,3,5,-trimethylene-2,4,6,-trinitramine; hexahydro-1,3,5-trinitro-S-triazine].

*S*

Safety fuse.
Salts of organic amino sulfonic acid explosive mixture.
Salutes (bulk).
Silver acetylide.
Silver azide.
Silver fulminate.
Silver oxalate explosive mixtures.
Silver styphnate.
Silver tartrate explosive mixtures.
Silver tetrazene.
Slurried explosive mixtures of water, inorganic oxidizing salt, gelling agent, fuel, and sensitizer (cap sensitive).
Smokeless powder.
Sodatol.
Sodium amatol.
Sodium azide explosive mixture.
Sodium dinitro-ortho-cresolate.
Sodium nitrate explosive mixtures.
Sodium nitrate-potassium nitrate explosive mixture.
Sodium picramate.
Special fireworks.
Squibs.
Styphnic acid explosives.

*T*

Tacot [tetranitro-2,3,5,6-dibenzo-1,3a,4,6a tetrazapentalene].
TATB [triaminotrinitrobenzene].
TATP [triacetonetriperoxide].
TEGDN [triethylene glycol dinitrate].
Tetranitrocarbazole.
Tetrazene [tetracene, tetrazine, 1(5-tetrazolyl)-4-guanyl tetrazene hydrate].
Tetrazole explosives.
Tetryl [2,4,6 tetranitro-N-methylaniline].
Tetrytol.
Thickened inorganic oxidizer salt slurried explosive mixture.
TMETN [trimethylolethane trinitrate].
TNEF [trinitroethyl formal].
TNEOC [trinitroethylorthocarbonate].
TNEOF [trinitroethylorthoformate].
TNT [trinitrotoluene, trotyl, trilite, triton].
Torpex.
Tridite.
Trimethylol ethyl methane trinitrate composition.
Trimethylolthane trinitrate-nitrocellulose.

Case 2:13-mj-00836-NJ   Filed 05/14/13   Page 22 of 23   Document 1

Trimonite.
Trinitroanisole.
Trinitrobenzene.
Trinitrobenzoic acid.
Trinitrocresol.
Trinitro-meta-cresol.
Trinitronaphthalene.
Trinitrophenetol.
Trinitrophloroglucinol.
Trinitroresorcinol.
Tritonal.

*U*

Urea nitrate.

*W*

Water-bearing explosives having salts of oxidizing acids and nitrogen bases, sulfates, or sulfamates (cap sensitive).
Water-in-oil emulsion explosive compositions.

*X*

Xanthamonas hydrophilic colloid explosive mixture.

B. Todd Jones,
*Acting Director.*
[FR Doc. 2012–23241 Filed 9–19–12; 8:45 am]
BILLING CODE 4410–FY–P

---

## DEPARTMENT OF JUSTICE

### Antitrust Division

### Notice Pursuant to the National Cooperative Research and Production Act of 1993; American Society of Mechanical Engineers

Notice is hereby given that, on August 27, 2012, pursuant to Section 6(a) of the National Cooperative Research and Production Act of 1993, 15 U.S.C. 4301 *et seq.* ("the Act"), the American Society of Mechanical Engineers ("ASME") has filed written notifications simultaneously with the Attorney General and the Federal Trade Commission disclosing additions or changes to its standards development activities. The notifications were filed for the purpose of extending the Act's provisions limiting the recovery of antitrust plaintiffs to actual damages under specified circumstances. Specifically, since April 26, 2012, ASME has published six new standards, initiated one new standards activity, withdrawn one published standard, and withdrawn one proposed standard from consideration within the general nature and scope of ASME's standards development activities, as specified in its original notification. More detail regarding these changes can be found at *www.asme.org.*

On September 15, 2004, ASME filed its original notification pursuant to

Section 6(a) of the Act. The Department of Justice published a notice in the **Federal Register** pursuant to Section 6(b) of the Act on October 13, 2004 (69 FR 60895).

The last notification was filed with the Department on April 27, 2012. A notice was published in the **Federal Register** pursuant to Section 6(b) of the Act on May 24, 2012 (77 FR 31041).

Patricia A. Brink,
*Director of Civil Enforcement, Antitrust Division.*
[FR Doc. 2012–23167 Filed 9–19–12; 8:45 am]
BILLING CODE P

---

## DEPARTMENT OF JUSTICE

### Office of Justice Programs

**[OJP (BJA) Docket No. 1605]**

### Meeting of the Global Justice Information Sharing Initiative Federal Advisory Committee

**AGENCY:** Office of Justice Programs (OJP), Justice.

**ACTION:** Notice of meeting.

**SUMMARY:** This is an announcement of a meeting of the Global Justice Information Sharing Initiative (Global) Federal Advisory Committee (GAC) to discuss the Global Initiative, as described at *www.it.ojp.gov/global.*

**DATES:** The meeting will take place on Wednesday, October 24, 2012, from 8:30 a.m. to 4:00 p.m. ET.

**ADDRESSES:** The meeting will take place at the Sheraton Premiere at Tysons Corner hotel, 8661 Leesburg Pike, Vienna (Tysons Corner), VA 22182, Phone: (703) 448–1234.

**FOR FURTHER INFORMATION CONTACT:** J. Patrick McCreary, Global Designated Federal Employee (DFE), Bureau of Justice Assistance, Office of Justice Programs, 810 7th Street, Washington, DC 20531; Phone: (202) 616–0532 [note: This is not a toll-free number]; Email: *James.P.McCreary@usdoj.gov.*

**SUPPLEMENTARY INFORMATION:** This meeting is open to the public. Due to security measures, however, members of the public who wish to attend this meeting must register with Mr. J. Patrick McCreary at the above address at least (7) days in advance of the meeting. Registrations will be accepted on a space available basis. Access to the meeting will not be allowed without registration. All attendees will be required to sign in at the meeting registration desk. Please bring photo identification and allow extra time prior to the meeting.

Anyone requiring special accommodations should notify Mr. McCreary at least seven (7) days in advance of the meeting.

**Purpose**

The GAC will act as the focal point for justice information systems integration activities in order to facilitate the coordination of technical, funding, and legislative strategies in support of the Administration's justice priorities.

The GAC will guide and monitor the development of the Global information sharing concept. It will advise the Assistant Attorney General, OJP; the Attorney General; the President (through the Attorney General); and local, state, tribal, and federal policymakers in the executive, legislative, and judicial branches. The GAC will also advocate for strategies for accomplishing a Global information sharing capability.

Interested persons whose registrations have been accepted may be permitted to participate in the discussions at the discretion of the meeting chairman and with approval of the DFE.

J. Patrick McCreary,
*Global Designated Federal Employee, Bureau of Justice Assistance, Office of Justice Programs.*
[FR Doc. 2012–23157 Filed 9–19–12; 8:45 am]
BILLING CODE 4410–18–P

---

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

**[Notice 12–075]**

### NASA Advisory Council; Science Committee; Earth Science Subcommittee; Meeting

**AGENCY:** National Aeronautics and Space Administration.

**ACTION:** Notice of meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act, Public Law 92–463, as amended, the National Aeronautics and Space Administration (NASA) announces a meeting of the Earth Science Subcommittee of the NASA Advisory Council (NAC). This Subcommittee reports to the Science Committee of the NAC. The meeting will be held for the purpose of soliciting, from the scientific community and other persons, scientific and technical information relevant to program planning.

**DATES:** Wednesday, October 10, 2012, 12:30 a.m. to 2:30 p.m., Local Time.

**ADDRESSES:** This meeting will take place telephonically. Any interested person may call the USA toll free conference